1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
2                         ALEXANDRIA DIVISION

3

4   IN RE:  LUMBER LIQUIDATORS  )  MDL No. 1:15-md-02627
    CHINESE-MANUFACTURED        )
5   FLOORING PRODUCTS MARKETING,)  Alexandria, Virginia
    SALES PRACTICES AND         )  December 1, 2015
6   PRODUCTS LIABILITY          )  2:00 p.m.
    LITIGATION                  )
7   _____)  Pages 1 - 83

8

9      TRANSCRIPT OF DEFENDANT LUMBER LIQUIDATORS, INC.'S

10   MOTION TO DISMISS FIRST AMENDED REPRESENTATIVE CLASS

11   ACTION COMPLAINT AND TO STRIKE PLAINTIFFS' REQUEST FOR

12                   INJUNCTIVE RELIEF CLASSES

13             BEFORE THE HONORABLE ANTHONY J. TRENGA

14                UNITED STATES DISTRICT COURT JUDGE

15          AND THE HONORABLE THOMAS RAWLES JONES, JR.

16                 UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25      COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

```
 1   APPEARANCES:

 2   FOR PLAINTIFFS JAMIE DEUTSCH AND LISA DEUTSCH:

 3        STEVEN J. TOLL, ESQUIRE
          DOUGLAS J. MCNAMARA, ESQUIRE
 4        COHEN MILSTEIN
          1100 New York Avenue, N.W., Suite 500
 5        Washington, D.C.  20005
          (202) 408-4600
 6
          NANCY L. FINEMAN, ESQUIRE
 7        COTCHETT, PITRE & MCCARTHY, LLP
          840 Malcolm Road
 8        Burlingame, California  94010
          (650) 697-6000
 9
     FOR PLAINTIFFS JOHN TYRRELL, TRACIE-LINN TYRRELL,
10   ADRIANA SCOTT, MARIA RONQUILLO, MARK SCOTT, MONTY EARL,
     ROMUALDO RONQUILLO, KAREN WARSHAW, CASANDRA BARRETT,
11   KENNETH BARRETT, KRISTIN BRANDT, LAURA WASHINGTON, LILA
     WASHINGTON, RYAN BRANDT, AND SCOTT AND MARYANNE BRAY:
12
          STEVE W. BERMAN, ESQUIRE
13        HAGENS, BERMAN, SOBOL, SHAPIRO, LLP
          1918 Eighth Avenue, Suite 3300
14        Seattle, Washington  98101
          (206) 623-7292
15
     FOR PLAINTIFFS DAN JOHNSON AND TOBY MACDONALD:
16
          FRANCIS J. BALINT, JR., ESQUIRE
17        BONNETT, FAIRBOURN, FRIEDMAN & BALINT, PC
          4023 Chain Bridge Road
18        Fairfax, Virginia  22030
          (703) 865-7255
19

20

21

22

23

24

25
```

```
 1  APPEARANCES CONTINUED:

 2  FOR DEFENDANTS LUMBER LIQUIDATORS HOLDINGS, INC.;
    LUMBER LIQUIDATORS LEASING, LLC; LUMBER LIQUIDATORS
 3  PRODUCTION, LLC; LUMBER LIQUIDATORS SERVICES, LLC; AND
    LUMBER LIQUIDATORS, INC.:
 4
         DIANE P. FLANNERY, ESQUIRE
 5       BETHANY G. LUKITSCH, ESQUIRE
         McGUIREWOODS, LLP
 6       800 East Canal Street
         Richmond, Virginia  23219
 7       (804) 775-1000

 8       WILLIAM L. STERN, ESQUIRE
         MORRISON & FOERSTER, LLP
 9       425 Market Street
         San Francisco, California  94105-2482
10       (415) 268-7637

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  Case No. 1:15-md-2627, *In Re:*

2  *Lumber Liquidators Chinese-Manufactured Flooring*

3  *Products Marketing, Sales Practices and Products*

4  *Liability Litigation.*

5          Will counsel please identify themselves for

6  the record.

7          MR. TOLL:  Good afternoon, Your Honors.  I'll

8  save everyone else from getting up.  This is Steven

9  Toll, Colead Counsel Nancy Fineman and Steve Berman,

10  and in the second row, Douglas McNamara from my office,

11  and Frank Balint on one of the other Eastern District

12  of Virginia cases.

13          JUDGE TRENGA:  All right.  Welcome.

14          MR. STERN:  Good afternoon, Your Honors.  May

15  it please the Court.  My name is William Stern for the

16  colead defense counsel, and with me is Bethany Lukitsch

17  and Diane Flannery from McGuireWoods.

18          JUDGE TRENGA:  All right.  Welcome to

19  everyone for our status conference.  What I'd like to

20  do is work from the agenda.

21          But before I do that, let me just confirm

22  with our CourtCall representative that we do have a

23  good connection.  Is someone from CourtCall on the

24  line?

25          COURTCALL REPRESENTATIVE:  This is the

1  CourtCall operator, Your Honor, and we do have a good

2  connection.

3          JUDGE TRENGA:  All right.  Thank you.

4          COURTCALL REPRESENTATIVE:  You're welcome.

5          JUDGE TRENGA:  The first item is the oral

6  argument on the motion to dismiss.  I'm going to take

7  that up last after we go through the rest of the

8  agenda.

9          I did meet with lead counsel in chambers.

10 What I'd like to do is go through each of these items

11 and have counsel summarize what we discussed.  Given

12 the nature of some of these items, I'm going to call on

13 the defendants first but ask both sides to put on the

14 record anything they think needs to fairly be stated.

15          Let me begin with the status of the

16 non-laminate cases.

17          Ms. Flannery.

18          MS. FLANNERY:  Yes, Your Honor.  There's one

19 remaining non-Chinese laminate case pending.  That is

20 the *Vincent* case.  Defendants have requested an

21 opportunity to file a motion to dismiss with respect to

22 the *Vincent* class action, and it's our understanding

23 that our motion to dismiss will be due January 12.

24          JUDGE TRENGA:  Yes.  I've set a filing date

25 for that motion on January 12, and it should be

1  responded to by the plaintiff as required under our

2  local rules.

3          MS. FLANNERY:  Thank you, Your Honor.

4          We're not aware of any other remaining

5  actions alleging any other product other than Chinese

6  laminate.

7          JUDGE TRENGA:  All right.  Very good.

8          The status of the state cases, would you like

9  to address that as well?

10          MS. FLANNERY:  Yes.  There are eight state

11  court cases where individual plaintiffs are pursuing

12  claims based on Chinese laminate.  We're working with

13  plaintiffs to pursue a course of cooperation and trying

14  to take advantage of the discovery that's being done in

15  the MDL.

16          Our next step in the process would be to

17  provide the plaintiffs' cocounsel in those individual

18  cases copies of our confidentiality agreement that you

19  have signed off on in this case.  Thereafter we'll also

20  be sending a letter to them telling them how they'll be

21  able to participate and access the data that's been

22  produced here.

23          JUDGE TRENGA:  All right.  Thank you.

24          With respect to the discovery, why don't you

25  go ahead and summarize your position on that and where

1  we are, and I'll ask Mr. Toll then to supplement any

2  matters he thinks needs to be put on the record.

3          MS. FLANNERY:  Sure.  With respect to

4  document production, the parties and the Court have

5  discussed the status of document discovery and

6  privilege issues, and we've developed a procedure for

7  moving forward with those privilege issues.  Currently

8  the first privilege-related motions will be jointly

9  filed by the parties on December 18.

10          JUDGE TRENGA:  All right.

11          MS. FLANNERY:  The second issue concerns

12  plaintiffs' fact sheets.  There are a number of

13  plaintiffs who have not yet provided fact sheets, nor

14  provided documents in connection with those fact

15  sheets.  Defendants will be filing a Rule 37 motion

16  this week requesting that plaintiffs produce these fact

17  sheets or any documents that they may have in their

18  possession that they plan to rely upon in this

19  litigation by December 18 and asking the Court to

20  consider sanctions should plaintiffs fail to provide

21  the requested fact sheets specifically.

22          JUDGE TRENGA:  All right.  Those motions will

23  be referred to Judge Jones in accordance with our

24  ordinary practice.

25          MS. FLANNERY:  Thank you, Your Honor.

1          JUDGE TRENGA:  Mr. Toll, is there anything

2    you'd like to add to any of those agenda items?

3          MR. TOLL:  The only thing, Your Honor, just

4    for the record, you'll note that we've been in touch

5    with plaintiffs' counsel in the *Vincent* case trying to

6    talk to him about, you know, the best method to

7    proceed.  He has expressed some willingness to remand

8    his case, but we're not sure yet whether that's on an

9    individual or class basis.

10          So if it is on an individual basis, that may

11    mute what the defendants -- if it's acceptable to the

12    defendants -- which I believe it will be -- and to the

13    Court, it would remove that case, or it would be

14    remanded back and there would be no need for their

15    motion.  We don't know yet if he's willing to do that.

16          With regard to the in-state cases, the

17    individual claims being brought there, we will set up a

18    procedure to allow access, probably for a cost, through

19    our vendor to get documents that, you know, have been

20    produced by defendants to us as well.

21          And with regard to the last item Ms. Flannery

22    raised, again, we're generally in agreement that that

23    is the process we'll proceed forward with on the

24    privilege documents, and we will send -- with regard to

25    the fact sheets, we will send out something tomorrow by

1  e-mail to all the plaintiffs' counsel kind of reminding

2  those who have not yet completed the fact sheets that

3  they ought to do so promptly or be subject to a motion

4  and also to be in touch with those who have not yet

5  produced documents, that if they have responsive

6  documents, they should produce those.  So we'll follow

7  up tomorrow.

8          JUDGE JONES:  You can quote me as saying

9  they're treading on the edge of disaster.

10         MR. TOLL:  I'll quote that.  Thank you, Your

11  Honor.

12         JUDGE TRENGA:  All right.  With respect to

13  Item 5, appointment of liaison counsel for the Virginia

14  cases, there have recently been a number of voluntary

15  dismissals.  We are now down to only two Virginia

16  cases, one of which is involving Mr. Balint, who is

17  here, and one other case.  In light of those numbers,

18  I'm not going to make a formal appointment of liaison

19  or lead counsel for those cases but simply ask that

20  Mr. Balint -- and I believe it's Mr. Wise in the other

21  case -- continue their close coordination with

22  plaintiffs' counsel.

23         Mr. Balint, did you want to say something

24  about this?

25         MR. TOLL:  One thing, Your Honor.

```
 1              JUDGE TRENGA:  All right.

 2              MR. TOLL:  We went over this just briefly.

 3    I'm told there could be a third case that still is on

 4    the docket, an Eastern District of Virginia case.  So

 5    that's the one thing I'm not certain about.

 6              JUDGE TRENGA:  All right.

 7              MR. TOLL:  Mr. Balint, what's the name of

 8    that one?

 9              MR. BALINT:  It's the Kumar case, Dennis

10    Reich is the attorney on that.

11              JUDGE TRENGA:  Who is the attorney?  Why

12    don't you come forward and identify yourself for the

13    record.

14              MR. BALINT:  Good afternoon, Your Honor.

15    Frank Balint.

16              JUDGE TRENGA:  Yes.

17              MR. BALINT:  So in anticipation of this

18    appointment process, I had caucus with all of the EDVA

19    plaintiffs.  That, as you have seen, has led to a

20    number of voluntary dismissals.  The flock has shrunk

21    considerably.  As I understand it, we're down to two

22    cases.  The Johnson case, which is our case, with a

23    Massachusetts plaintiff, and the Kumar case, which is

24    Mr. Reich, R-E-I-C-H.  He's the lead attorney on that

25    case, and that is an Ohio plaintiff in that case.
```

1           Also, I don't believe I've seen the motion to

2  dismiss filed yet or the voluntary dismissal filed yet,

3  but I believe the *Marmonti* case will be dismissed.

4           JUDGE TRENGA:  All right.  That's the only

5  other one I had.  I did not have the Reich case down.

6  If you would, continue to coordinate with those

7  lawyers.

8           MR. BALINT:  I'm happy to do that, Your

9  Honor.

10          Also, I hope I'll have an opportunity to talk

11 to Judge Jones a little bit about scheduling, making

12 some unique scheduling in connection with the EDVA

13 cases.

14          JUDGE TRENGA:  All right.

15          MR. BALINT:  Thank you, Your Honor.

16          JUDGE TRENGA:  The only other agenda item was

17 discussion on the submission of attorney's fees orders.

18 I've met with plaintiffs' counsel, and they're going to

19 bring to my attention any formal action that may be

20 appropriate as we proceed through this process.

21          All right.  Anything else about any of the

22 agenda items?

23          MR. TOLL:  No, Your Honor.

24          JUDGE TRENGA:  All right.

25          MR. STERN:  No, Your Honor.

 1              JUDGE TRENGA:  All right.  That leaves the

 2 motion to dismiss and oral argument.

 3              JUDGE JONES:  I will retire from the bench.

 4              Mr. Balint, if you wouldn't mind meeting me

 5 in Judge Trenga's chambers for a couple of minutes.

 6              MR. BALINT:  Sure.  I'm happy to do that.

 7              JUDGE JONES:  Then we'll proceed with what we

 8 need to do and whether we can do it now.

 9              JUDGE TRENGA:  All right.

10         (Judge Jones and Mr. Balint exit.)

11              JUDGE TRENGA:  We have Lumber Liquidators'

12 motion to dismiss the first amended representative

13 class action complaint and to strike plaintiffs'

14 request for injunctive relief, which is Docket

15 Number 597.  I've reviewed the briefing and would be

16 pleased to hear further from counsel.

17              Mr. Stern.

18              MR. STERN:  Thank you, Your Honor.

19              Your Honor, I plan to address three issues.

20 I've chosen the three issues because the resolution of

21 these three issues is in some ways a threshold or

22 gateway decision that could unlock some of the other

23 state-by-state issues.  It's not that those other

24 issues are ones I'm disregarding.  I'm perfectly

25 available to answer the Court's questions.

```
 1              Let me identify first what the three issues
 2    are.  The first issue I plan to address is what does
 3    the California regulation that's at issue here require
 4    and how does the first amended representative class
 5    action complaint measure up.
 6              The second issue is the false advertising or
 7    affirmative misrepresentation allegations in the
 8    representative complaint:  Do they state a claim as
 9    measured by Article III standing and by the
10    particularity of requirements of Rule 9(b)?
11              I'm going to pause there, and I'll identify
12    the third issue in a moment.
13              The resolution of those two issues will in
14    many ways resolve some of what I call the nested issues
15    in some of the state-by-state claims because all of
16    them in many ways turn on these threshold issues, these
17    two threshold issues.
18              The third issue is the declaratory judgment
19    claim.  Let me take that one up first because I don't
20    have a lot to say about it.  The question there is
21    whether the declaratory judgment claim disposes of the
22    entire dispute.  The one thing about which I think both
23    parties agree is that were this Court to enter
24    declaratory judgment, it would not dispose of the
25    entire dispute.  And for that reason alone, we think
```

1  that claim should be dismissed.

2        I will say this:  That embedded inside that

3  declaratory judgment claim is really plaintiffs'

4  interpretation of how the California regulation works.

5  So in many ways, this folds back to the first argument

6  which I'm about to address.  But we don't even need to

7  get there because I think neither side really disputes

8  that this claim would not dispose of the entire cause

9  of action.

10        So with that introduction and road map, let

11  me first turn to the first issue, which is what does

12  the California regulation require and does the

13  representative complaint measure up.  The parties have

14  strikingly different views about what the California

15  regulation or the Airborne Toxic Control Measures, the

16  ATCM, what it requires.

17        If our view is correct, then the complaint

18  can't stand as pled, and it will need to be repled.

19  That's what I plan to address today:  What does the

20  ATCM require, and does the representative complaint

21  measure up?  And if it doesn't, why not?

22        I have prepared a hand-up which I gave to the

23  Court prior to the hearing.

24        JUDGE TRENGA:  I do have it.

25        MR. STERN:  It's kind of -- if I may refer to

1  it as sort of an idiot's guide to the ATCM, and I say

2  that with no disrespect to the Court.  Mr. Berman and

3  I, plaintiffs' counsel and I have been working with the

4  ATCM longer than the Court has, and it's not an easy

5  regulation to penetrate, at least not at first blush.

6  It takes several passes through it.  What I have handed

7  up is a shortened version of just those provisions that

8  I think I'm going to address and that are relevant to

9  the motion to dismiss.

10            Coincidentally, I noticed that Mr. Berman is

11  also going to have a handout, which is the entire ATCM

12  measure, and plaintiffs also have highlighted the

13  relevant provisions.  And not surprisingly, his

14  highlights pretty closely match my hand-up.  So I don't

15  think we disagree about what the pertinent provisions

16  are going to be.

17            There is a lot of density and clutter in the

18  ATCM.  Let me give a brief overview of how we believe

19  it operates.  There are a number of Airborne Toxic

20  Control Measure regulations that have been promulgated

21  by the California Air Resources Board.  They're all

22  very specific.  They've all been promulgated pursuant

23  to an enabling statute.

24            The one we're interested in concerns very

25  specifically formaldehyde emissions from CWP.  CWP is

1  the shorthand for composite wood products, the type of

2  product we're talking about here.  So it's product

3  specific, and it's formaldehyde specific.  It's found

4  at 17, Code of California Regulations -- and while

5  there are 12 subparts, all of them are preceded by the

6  Section 93120, and then it proceeds .1 through .12.

7          If one were to start from scratch and look at

8  how one were to unbundle the responsibilities or

9  liabilities of an actor in Lumber Liquidators' position

10  in this case, where do you start?  The ATCM really

11  divides -- if you think about it this way, it

12  divides --

13          JUDGE TRENGA:  Mr. Stern, I've gotten a

14  notice that it's a little difficult for the CourtCall

15  connection to pick up your voice.  So maybe you can

16  adjust the microphone a little bit and either speak

17  more directly into it or raise your voice slightly.

18          MR. STERN:  Or stop wandering around.  I

19  notice that I've been doing that.  I'll try and hang on

20  and stay close to the microphone.  Thank you.

21          JUDGE TRENGA:  All right.

22          MR. STERN:  There are essentially two types

23  of provisions setting aside the definitions in some of

24  the other general provisions.  There are provisions

25  that deal with the type of actor, and then there are

1  provisions that deal with the product.

2          So where would one start if you were to face

3  this issue for the first time and you were to ask

4  yourself:  What are the responsibilities of an actor,

5  such as Lumber Liquidators, under this ATCM?  You would

6  first start, I think, by asking yourself:  Well, what

7  type of entity is Lumber Liquidators?

8          And you'd go to the definition section, and

9  you would find that under the ATCM, there are at least

10  five different types of actors who deal with composite

11  wood products.  There is a subset of provisions dealing

12  with manufacturers and another one dealing with

13  fabricators.

14          Let me pause there for a moment.  In this

15  case, it's not --

16          JUDGE TRENGA:  Let me ask a question:  Why

17  would Lumber Liquidators not fit the definition, as

18  well, of a distributor?

19          MR. STERN:  It could be a distributor.  It

20  could also be an importer.

21          JUDGE TRENGA:  All right.

22          MR. STERN:  For our purposes, it doesn't much

23  matter.  I think plaintiffs and we agree we're probably

24  a retailer.

25          JUDGE TRENGA:  All right.

1          MR. STERN:  But the provisions of any of

2    those three are really the same for purposes of this

3    discussion.  Okay.

4          JUDGE TRENGA:  All right.

5          MR. STERN:  In this case, the manufacturer in

6    the definitions refers to the company that makes the

7    MDF, the medium density fiberboard.  The Court may

8    recall from a couple of sessions ago I had brought with

9    me -- as a show-and-tell, I brought several examples of

10   an MDF piece of flooring which had the MDF core.

11   That's called the CWP or composite wood product, and on

12   top of that, it had the laminate.  The top could also

13   be a wood veneer.  In this case, they all happen to be

14   laminate.

15         So the manufacturer makes the core, and in

16   this case, the manufacturers were all from China.  They

17   don't have to be.  They could be domestically produced,

18   but in this case, all of the products at issue, the

19   manufacturer was from China.

20         Once that floor is manufactured --

21         JUDGE TRENGA:  The same manufacturer?

22         MR. STERN:  Different.

23         JUDGE TRENGA:  Different manufacturers?

24         MR. STERN:  Yes.

25         Once the manufacturer produces the core, it

1   then moves on to the fabricator, and the fabricator is

2   the entity that finishes the product.  And in this

3   case, what that means is the fabricator puts the

4   laminate on top and is responsible for stickering the

5   product, putting that CARB sticker on the product that

6   we'll talk about in a moment.

7           The fabricators in this case were also from

8   China.  Again, they don't have to be.  There can be

9   domestic or European produced fabricators, but in this

10  case, they happen to be from China.

11          So once you leave the manufacturer and

12  fabricator world, then we get into the world of the

13  downstream distributors and the downstream players and

14  actors, and those include distributors, retailers, and

15  importers.

16          Lumber Liquidators is probably a retailer.

17  If you look at the definition in the selected

18  provisions, the definition of retailer is in .1(38),

19  we're probably a retailer.  Again, it doesn't much

20  matter.

21          So with that as sort of a general background,

22  where do we start?  I would submit we start with the .8

23  section called Requirements for Retailers, which is the

24  first section I've given the Court in the three-page

25  handout called Selected Provisions of the ATCM.

1          The requirements for retailers are twofold

2   under .8, there's .8(a) and .8(b).  So .8(a) is an

3   emissions standard, and it says, All retailers must

4   comply with the requirements of section -- I'm going to

5   truncate this -- .2(a).  My contention -- and I don't

6   think this is disputed -- is that .8(a) has no

7   independent content.  For that content, one needs to

8   look at .2(a) which I'm going to talk about in a

9   minute.

10         So what about .8(b)?  So .8(b) says,

11  Retailers -- who you'll recall are a downstream player

12  in this scenario -- must take reasonable prudent

13  precautions to ensure that the composite wood products

14  and the composite wood products contained in finished

15  goods that they purchase comply with the emission

16  standards.  That's the product standard, and that goes

17  on to describe what those reasonable prudent

18  precautions are.

19         So before I get too deeply into what these

20  embedded requirements are --

21         JUDGE TRENGA:  What about the last sentence

22  of .8(b)?

23         MR. STERN:  Of .8(b)?

24         JUDGE TRENGA:  Of .8(b), yes.

25         MR. STERN:  Okay.  Are you referring to my

1   hand-up or the --

2           JUDGE TRENGA:  No, it's not on your handout.

3           MR. STERN:  Okay.

4           JUDGE TRENGA:  It's the sentence that says,

5   This section does not affect the liability of any

6   person for any violation of Section 93120.2(a).

7           MR. STERN:  To me that section says that the

8   retailer must comply with both (a) and (b).  It's an

9   and.  Compliance is an and and not an or requirement.

10          JUDGE TRENGA:  It has to comply with (a) and

11  (b) of .8.

12          MR. STERN:  I'm sorry.  So .8(a) and .8(b).

13  And I don't think this is a disagreement between us and

14  plaintiffs.  I think that both sides would say that

15  there is the emissions standard and there's the

16  reasonable prudent precautions standard, and that's how

17  I read that last sentence.

18          In other words, what I think it's saying, to

19  put it in more of a vernacular, is just because you

20  take reasonable prudent precautions doesn't mean that

21  you are absolved from also being subject to the

22  emissions standard of .8(a), which in turn incorporates

23  .2(a).  That's my reading.

24          JUDGE TRENGA:  I see.  All right.

25          MR. STERN:  It's been a long time since I've

1  done tax law, but the statute is reminiscent of a tax

2  statute in many ways.  It's got a lot of defined terms,

3  and there's a lot of different actors and players.

4          By the way, in my handout, this is the one

5  way in which the handout diverges from the ATCM.  I

6  bolded all the defined terms.

7          JUDGE TRENGA:  That's fine.  Thank you.

8          MR. STERN:  Okay.  So if you look at

9  requirements for retailers, what we find is there are

10  two requirements:  You have to comply with .8(a), which

11  I believe does not have an independent content

12  requirement, and you need to comply with .8(b).  Or put

13  it differently, to state a violation of the ATCM by a

14  retailer, you must allege an .8(a) and an .8(b)

15  violation.

16          So what does .8(a) require, and that, in

17  turn, requires that we take a look at .2(a), the

18  emissions standard.  That's set forth in the second

19  page of my abbreviated handout, and this is what I

20  referred to earlier as a product standard.  This

21  focuses on the product.  .2(a) has two parts.  The

22  first part is a prohibition on sales, and the second

23  part is a standard of when a product is not compliant.

24          So the first part, it says, No person shall

25  sell, supply, offer for sale, or manufacture for sale

1   in California any composite wood product which at the

2   time of sale or manufacture does not comply with the

3   emission standards in Table 1.

4           So in my handout, I've got a footnote,

5   Table 1 is an emissions standard that applies to the

6   core, just the MDF, not the finished product, the core,

7   which has two different standards depending on whether

8   we're talking about before or after January 2009.  It's

9   the .11 standard.

10          So what the first part says is you can't sell

11  cores if at the time of sale they exceed .11 parts per

12  million.  I'm going to talk in a minute about how we

13  don't sell cores and why that matters.  So I'm kind of

14  foreshadowing a point I'm going to make in a moment,

15  but the prohibition on sales provision of .2(a) doesn't

16  apply to this case.  This is one of our disagreements

17  with the plaintiffs.

18          The second part does.  That does have an

19  application here.  .2(a), the second part is a

20  noncompliance standard, and what it says is that a

21  product does not comply with the emissions standards in

22  Table 1 if -- and then it lists five things.  The first

23  and the second are of no moment to this case because

24  the plaintiffs aren't relying on those.

25          The first, in my mind, I liken it to

1    paperwork violations.  So in other words, if we were

2    buying cores from a company that wasn't third-party

3    certified or licensed, that would be a (1) violation.

4    They don't allege that that's a violation.

5           Likewise, they don't allege a (2) violation.

6    A (2) violation in my mind is when the manufacturer

7    itself does self-testing and it flunks the .11

8    standard.  They don't allege that these flunk because

9    of a manufacturer's self-testing.

10          Of the five ways in which a product can be

11   noncompliant, three apply to cores and two apply to

12   finished goods.  The first three apply to cores, CWP.

13   The second apply to finished goods.  I'm going to come

14   back to this in a moment.  Again, I'm foreshadowing.

15   But the plaintiffs contend that we flunk (3).  That's

16   their claim, and they may also argue (4) or (5).  I'm

17   going to come back to that in a moment.  But right now

18   I just want to kind of lay out how the statute is

19   organized and the logic behind it.

20          So with that -- by the way --

21          JUDGE TRENGA:  Well, they argue, don't they,

22   first, that it violates (4), which, in turn, depends on

23   a violation of (3)?

24          MR. STERN:  They do argue (4), yes, and I can

25   address that.  If you work yourself through this, (4)

1  says, A finished good -- which is what we sell.  We

2  sell finished goods.  If a finished good contains any

3  composite wood product which does not comply with the

4  emission standards in Table 1, based on the criteria

5  set forth in paragraphs (1), (2), or (3) above.

6          So you're right.  A violation of (3) would

7  also be a violation of (4).

8          JUDGE TRENGA:  If the finished good contains

9  a wood composite that doesn't comply with the emission

10  standards in Table 1, that means that a product doesn't

11  comply with the emission standards?

12          MR. STERN:  That's right.

13          JUDGE TRENGA:  And product refers to the

14  composite wood products?

15          MR. STERN:  Maybe.  It depends.  The ATCM --

16  I was going to make this point, but you anticipated it,

17  Your Honor.

18          JUDGE TRENGA:  Well, I guess I'm focused on

19  what a product means.

20          MR. STERN:  Okay.  Product is an ambiguous

21  term throughout the ATCM.  Sometimes it means a

22  finished good.  Sometimes it means the composite wood

23  product.

24          In (3) -- and this is important for what I'm

25  about to say in a moment.  In (3), (3) applies just to

1  the core, just to the composite wood product.  So the

2  term "product" in the preamble necessarily refers just

3  to the core when we're talking about (3) as opposed to

4  (4).  (4) says a finished good contains a composite

5  wood product which does not contain.  It sounds like

6  I'm splitting hairs here, but believe me.  I'm not.

7           JUDGE TRENGA:  No.  That's the nature of the

8  statute.

9           MR. STERN:  These terms are defined

10 carefully.  Okay.

11          So in (4), to answer Your Honor's question,

12 product means a finished good that contains the core.

13 For (3), it's just the core.

14          JUDGE TRENGA:  Well, I'm looking at (a), and

15 (a) says, No person shall sell, supply, and so on any

16 composite wood product which doesn't comply with

17 Table 1.

18          MR. STERN:  Right.

19          JUDGE TRENGA:  So (a) is limited to composite

20 wood products, correct?  I'm sorry.  That paragraph is

21 limited to composite wood products?

22          MR. STERN:  That's our view.

23          JUDGE TRENGA:  Right.  Then it goes on to say

24 a product does not comply with Table 1.

25          MR. STERN:  Yes.

1        JUDGE TRENGA:  Wouldn't one necessarily have

2   to conclude that product is referring to composite wood

3   product?

4        MR. STERN:  No.  No.

5        JUDGE TRENGA:  Because only composite wood

6   products can violate Table 1.  So when you say a

7   product does not comply with Table 1, isn't that

8   necessarily referring to a composite wood product?

9        MR. STERN:  Not necessarily.  I'm reading it

10  very carefully here because precision is really

11  important.

12       JUDGE TRENGA:  All right.

13       MR. STERN:  I believe that the first part of

14  (a), the no person shall sell, that's what I referred

15  to earlier as a prohibition of sales, which I don't

16  believe is applicable here because that prohibition

17  only applies to people who sell cores.  You can go to

18  lumberyards that will sell just cores, just MDF boards

19  that are not finished.  We don't sell that, and they

20  don't allege that's what we sold.  So my contention is

21  that the prohibition on the sales part of .2(a) is

22  inapplicable to this case.

23       What is applicable to this case is the

24  noncompliance standard, which is the second larger part

25  of .2(a).  That says a product can flunk the compliance

1   standards in five ways.  The first three are just core

2   ways, and the last two are finished product ways.

3           I'm not sure that helped.

4           JUDGE TRENGA:  All right.

5           MR. STERN:  So with that as a background, how

6   does the first amended representative class action

7   complaint stack up?

8           JUDGE TRENGA:  Well, stay with me for a

9   moment on .2(a).

10          MR. STERN:  Yeah.

11          JUDGE TRENGA:  Under your theory, a retailer

12  could without liability sell a finished good that

13  contains a composite wood product that doesn't comply

14  with Table 1.

15          MR. STERN:  Correct, unless --

16          JUDGE TRENGA:  So why would you put (4) in?

17  What purpose does paragraph (4) play under your view of

18  the structure of this statute?

19          MR. STERN:  Yes, a good question.  A

20  retailer's sale of a finished good whose core violates

21  Table 1 is not in and of itself a violation of .2

22  unless that retailer failed to take reasonable prudent

23  precautions.

24          That gets us to .8(b).  One of the reasonable

25  prudent precautions is did the retailer know that the

1 core it was buying was not compliant with Table 1, and

2 that could happen in a number of ways.  Those

3 essentially are the five things in .2(a).  That's why

4 there is a notice requirement.  We call it a knowledge

5 requirement in our papers.  It doesn't actually say

6 that, but it's reasonably inferred from --

7          JUDGE TRENGA:  Well, under your

8 interpretation, you would end up with that view of the

9 statute's liability for a retailer even if you

10 eliminated paragraph (4), right?  Paragraph (4) isn't

11 necessary to reach how you view -- what paragraph is

12 it?  We just talked about it.  I'm sorry.  It's .8(b).

13          MR. STERN:  If Lumber Liquidators sold just

14 cores, just MDF, (3) and (4) would still have

15 applicability here.  What I think was going on in (1)

16 through (5) --

17          JUDGE TRENGA:  How does (4) feed into the

18 meaning of .8(b)?

19          MR. STERN:  Okay.  All right.  The way I

20 understand .8(a) and (b), the interplay, is that a

21 retailer has to take reasonable prudent precautions,

22 and those are described in .8(b).

23          JUDGE TRENGA:  That would apply whether or

24 not the wood core violates the emissions or not --

25          MR. STERN:  I'm going to come to that.

1           JUDGE TRENGA:  -- under your view.

2           MR. STERN:  Well, for purposes of .8(b), so

3  far that's correct.

4           So a retailer has to do two things:  One, it

5  has to take reasonable prudent precautions, and that

6  means it has to make sure it does all the paperwork.

7  It has to do all of things that are described in .8(b).

8  It doesn't have to do testing, but it has to do all of

9  those things.  Even if it does take reasonable prudent

10 precautions and does all of those things, it could

11 still be liable under .8(a) because that incorporates

12 .2(a) if it has knowledge that the cores it buys

13 violate (1) through (5) of .2(a).

14          JUDGE TRENGA:  You're reading in the

15 knowledge requirement?

16          MR. STERN:  That's a fair assessment.  I am

17 reading the knowledge part.  I think it's a fair

18 inference from .2(a) from the statute.

19          JUDGE TRENGA:  All right.

20          MR. STERN:  It doesn't say that.

21          JUDGE TRENGA:  All right.  I think I

22 understand your argument.

23          MR. STERN:  All right.  So how does the

24 representative class action complaint measure up to our

25 understanding of the ATCM?  We contend that it fails on

1   three grounds and should be dismissed.

2          The first ground is a pretty simple one, and

3   that is the retailer liability provision of .8(b) says

4   you must follow reasonable prudent precautions, and

5   they never alleged that.  They never even mention

6   .8(b), and they never allege that we failed to take

7   reasonable prudent precautions.  So that's kind of an

8   easy on-off switch.

9          Two, this part is a little trickier.  Two,

10  referring to .8(a), which incorporates .2(a) they never

11  allege a proper emissions standard violation of .2(a).

12  Okay.  They contend in their opposition brief and they

13  hint in their amended complaint that we violate

14  .2(a)(3).  That's the trigger they claim gives rise to

15  the emission violation, but that isn't an option.  It

16  isn't an option because on its face, (3) applies to

17  composite wood products, which is a defined term.  And

18  unless the Court is willing to read (3) to say

19  composite wood product or finished goods that contain

20  composite wood products, (3) is not an option.

21          JUDGE TRENGA:  All right.

22          MR. STERN:  They know how to say that, they

23  meaning CARB, the drafters of this.  They know how to

24  say that because that phrase is found elsewhere in many

25  of the other provisions.  They didn't say it.  So (3)

1  is not an option to make a finding that we flunked the

2  emission standards of .2.

3          It also isn't an option -- by the way, the

4  Court had asked about (4) or (5). Let's go through it.

5  They don't claim they're relying on (1) or (2). (3) is

6  not an option, we believe, because we sell finished

7  goods. That's not disputed. We don't sell composite

8  wood products. So what about (4) and (5)?

9          JUDGE TRENGA: Let me ask this: Do you think

10 the meaning of the word "product" in .2(a) in the

11 prefatory sentence before (1) through (5), that the

12 light is shed on the meaning of the word "product" by

13 the definition of "product type" in paragraph 36 of the

14 definitional section?

15         MR. STERN: I thought about making that

16 argument. I don't know that it does. But if it does,

17 it actually corroborates our view, and the reason is

18 the product type goes on to talk about a composite wood

19 product, not a finished good.

20         JUDGE TRENGA: Correct.

21         MR. STERN: If anything, it would confirm

22 that when CARB wants to say composite wood product,

23 they do. When they want to say finished product, they

24 do. They're very careful about not letting the two

25 blur together.

1              JUDGE TRENGA:  Let me ask you this:  If you

2  were to read .2(a) to say instead of product -- if you

3  substitute composite wood product -- a composite wood

4  product does not comply with the emission standards in

5  Table 1 if and so on, does your interpretation of the

6  statute hold up under that reading?

7              MR. STERN:  That interpretation wouldn't make

8  sense.  Why?  Because it goes on to set forth five ways

9  in which the product can flunk.

10             JUDGE TRENGA:  Right.

11             MR. STERN:  The first three are composite

12  wood products, and the second two are finished goods.

13             JUDGE TRENGA:  Right.

14             MR. STERN:  I think the only reasonable

15  reading of that prefatory word "product" is that it

16  could mean either composite wood product or finished

17  good depending on what the context of the (1) through

18  (5) say below that.

19             JUDGE TRENGA:  But the definition of product

20  type refers only to composite wood product.

21             MR. STERN:  Correct.  But under that

22  interpretation, (4) and (5) wouldn't make sense.

23  Because what it would be saying is in the prefatory

24  language the composite wood product flunks the emission

25  standards, and then it would go on to say if the

1   finished good passed certain characteristics.

2          JUDGE TRENGA:  Isn't it reasonable to say

3   that under (4), which feeds into (3), that a finished

4   good violates the emission standards just as a

5   composite wood product would violate the emission

6   standards if the finished good product contains a

7   composite wood product that violates the emission

8   standards as determined under (3)?

9          MR. STERN:  Correct, that would be

10  reasonable.  But that now gets into how do you find

11  that violation.  That gets into the testing problem,

12  which I was just about to talk about.

13         JUDGE TRENGA:  All right.  You're saying

14  that's reasonable, and that's not your interpretation

15  of it?

16         MR. STERN:  No.  That is my interpretation.

17  That is my interpretation.

18         JUDGE TRENGA:  So you read .2(a) as saying a

19  composite wood product does not comply with the

20  emissions standard if the finished good contains a

21  composite wood product that through testing, as

22  specified in (3), violates the emission standards?

23         MR. STERN:  Yes, I would agree with that.

24         JUDGE TRENGA:  Okay.

25         MR. STERN:  So we're getting very close to

1    the core of what this case is about with Your Honor's

2    questions.

3              JUDGE TRENGA:  And how do you understand that

4    position to be different from what the plaintiffs are

5    claiming?

6              MR. STERN:  Well, it flunks for a different

7    reason.  Well, first of all --

8              JUDGE TRENGA:  It flunks because the

9    compliance method wasn't satisfied --

10             MR. STERN:  Correct, yeah.

11             JUDGE TRENGA:  -- under (3)?

12             MR. STERN:  Yes.

13             JUDGE TRENGA:  All right.  Okay.

14             MR. STERN:  So to kind of recap that very

15   quickly, (3) is not an option because it says composite

16   wood product.  It doesn't say finished goods.  That's

17   our position.

18             JUDGE TRENGA:  Right.

19             MR. STERN:  But what about (4) and (5)?  They

20   don't allege that, but could they?

21             JUDGE TRENGA:  Well, they don't rely on (5)

22   because it relies on the enforcement method, correct?

23             MR. STERN:  As does (4).  Now we get into the

24   testing question.

25             JUDGE TRENGA:  All right.

1          MR. STERN:  The testing question is who has

2    to do the testing.  We know from .9 that all of the

3    different enforcement testing methods are preceded by

4    the requirement that that testing has to be done by ARB

5    or local air agency.  Okay.  Forget local air agency.

6    They're not --

7          JUDGE TRENGA:  That's the enforcement method?

8          MR. STERN:  Correct, yeah.

9          JUDGE TRENGA:  Okay.

10          MR. STERN:  So we know that testing to find a

11    failure under (4) and testing to find a failure under

12    (5) have to be done by ARB, and we know they weren't

13    here because plaintiffs allege -- they don't allege

14    they were.

15          JUDGE TRENGA:  Right.

16          MR. STERN:  Okay.  In fact, they don't

17    dispute this.  In their opposition, they pretty much

18    concede that the enforcement method has to be done by

19    ARB, and they're not relying on that.

20          What they are relying on -- and now we

21    finally do get to the nub of what this motion to

22    dismiss is all about.  What they're saying is that

23    they're relying on .2(a)(3) which we've just talked

24    about, which allows for two different testing methods,

25    the compliance and the enforcement testing method.  The

1    enforcement testing method has to be done by ARB.

2              JUDGE TRENGA:  Right.

3              MR. STERN:  They're not relying on that.

4              So what about the compliance test method?

5    That's what their entire claim now rides on.  That's

6    not available.  Because if you look at .9(a), which is

7    at pages 2 and 3 of my handout -- I'm sorry.  I didn't

8    abstract the compliance test method.  That's just the

9    enforcement test method.

10             They're now saying they did compliance

11   testing, not enforcement testing, and that this is

12   permissible to show a violation of (a)(3), but it's

13   not, first, because (a)(3) on its face only applies to

14   (4), not finished goods.  ARB could have said finished

15   goods that have CWP as its core.  They didn't.  They

16   knew how to say that.  They didn't.  So that's a hard

17   stop.  Two, compliance testing has to be testing

18   verified by a third-party certifier.  That's a defined

19   term.

20             JUDGE TRENGA:  All right.

21             MR. STERN:  What they allege is they have

22   labs who are certified labs.

23             JUDGE TRENGA:  All right.

24             MR. STERN:  But being a certified lab is not

25   being a third-party certifier.

1          JUDGE TRENGA:  That's what I want you to

2  focus on because that's what I understand your argument

3  to be, is that a lab certified by a third-party

4  certifier itself then can't be a third-party certifier

5  as to the emissions test.

6          MR. STERN:  Okay.  First of all, the

7  definition of third-party certifier is under .1(41),

8  and it describes the role that a third-party certifier

9  plays at three different things.

10          JUDGE TRENGA:  Well, it talks about how you

11  become a third-party certifier.

12          MR. STERN:  Correct.

13          JUDGE TRENGA:  Maybe the evidentiary record

14  isn't sufficient, but why wouldn't these certified labs

15  have been approved as a third-party certifier under

16  .4(a)?

17          MR. STERN:  Okay.  Because they could very

18  well have been -- they could be wearing that hat quite

19  separately.  They could be going to China from time to

20  time and doing inspections and audits.

21          JUDGE TRENGA:  Where does it say you have to

22  be doing that to be a third-party certifier?

23          MR. STERN:  It says that.  I'm going to try

24  and be very clear.

25          JUDGE TRENGA:  All right.

1          MR. STERN:  The testing they rely on to show

2    that we failed (a)(3) is testing that was done by

3    certified labs, but it was forensic testing in aid of

4    class action litigation.

5          JUDGE TRENGA:  I understand that, but why

6    does that disqualify it if it's done by a third-party

7    certifier?

8          MR. STERN:  Yes, because --

9          JUDGE TRENGA:  Because the testing has to be

10   done anytime after the manufacture.

11         MR. STERN:  No.  The testing --

12         JUDGE TRENGA:  The compliance testing rather.

13         MR. STERN:  Plaintiffs didn't do compliance

14   testing, and we know that.  They did what CARB would

15   regard as inspection testing, the kind that accompanies

16   a facility visit.  That's what this compliance testing

17   refers to.  That testing is described in .9(a),

18   Compliance Test -- if you look at .9(a), it describes

19   the manufacturer's self-testing, which has to be done

20   under .9(a).

21         JUDGE TRENGA:  Hold on a moment.

22         MR. STERN:  I'm sorry.  I'll wait.

23         JUDGE TRENGA:  All right.  It says compliance

24   testing shall be demonstrated by using one of the

25   following:  The primary method, the secondary method.

1    And you're saying that the -- I guess there's an

2    alternative secondary test.

3              MR. STERN:  Before we even get there, look at

4    the first paragraph of .9(a).  This is what I'm relying

5    on.

6              JUDGE TRENGA:  All right.

7              MR. STERN:  .9(a) says, Compliance with the

8    emission standards for an MDF shall be demonstrated by

9    conducting product emissions tests verified by

10   third-party certification as specified in

11   Section 93120.4.  Okay.  If you go to 93120.4, that's

12   the section that deals with third-party certifiers.

13             JUDGE TRENGA:  Right.  That has to be a

14   third-party certification by someone who is certified

15   as a third-party certifier.

16             MR. STERN:  Yes.  Unfortunately, compliance

17   testing is not defined, but compliance testing that's

18   referred to in .4 is the compliance testing that

19   third-party certifiers do in aid of either doing their

20   job as auditors of the manufacturer or spot-checking

21   the manufacturer's compliance.

22             JUDGE TRENGA:  Where do you get that from the

23   statute?

24             MR. STERN:  Okay.  That's through --

25             JUDGE TRENGA:  Because the prohibition under

1   .2(a) is you can't sell anything that violates the

2   table at any time of the sale or manufacture.  So

3   presumably, in order to determine whether you're in

4   violation of (a)(2) contemplates a point in time of

5   testing beyond the point of manufacture.

6          MR. STERN:  All right.  The compliance

7   testing of .9(a) says it has to be done in the manner

8   set forth in .4, and .4 talks about the responsibility

9   of the third-party certifiers.  And third-party

10  certifiers are defined in .1(41).

11         JUDGE TRENGA:  I'm looking for the

12  responsibilities of the third-party certifiers.  It

13  talks about who they are and how you become one.

14         MR. STERN:  That really is all there is.

15  It's in .4.

16         JUDGE TRENGA:  Okay.

17         MR. STERN:  What a third-party certifier

18  means under the definition of (41) is an organization

19  or entity approved by CARB that verifies the accuracy

20  of the emission test procedures and facilities used by

21  manufacturers -- that's not what these tests were.

22         JUDGE TRENGA:  I'm sorry.  Where are you

23  reading?

24         MR. STERN:  I'm sorry.  I'm now looking at

25  the definition of the third-party certifier.

1          JUDGE TRENGA:  Right.  That's in definitions?

2          MR. STERN:  Yeah.  It's .1(41).

3          JUDGE TRENGA:  (41), right?

4          MR. STERN:  Yes.

5          So to anchor this, the Court's question is

6    why weren't these certified labs who might very well be

7    wearing hats elsewhere as third-party certifiers, why

8    can't these tests qualify as compliance tests.  That's

9    the question.

10          If you look at (41), the definition of a

11   third-party certifier, it means an organization

12   approved by CARB that:

13          (A) verifies the accuracy of the emission

14   test procedures and facilities used by manufacturers to

15   conduct formaldehyde emission tests.  That's not what

16   these tests are.  They don't allege that.

17          (B) monitors manufacturer quality assurance

18   programs.  They don't allege that either.

19          And (C) provides independent audits and

20   inspections.  They don't allege that either.

21          So whatever these tests were, we know they

22   were forensic tests in aid of litigation.  We know they

23   were not third-party certifier tests that were done

24   pursuant to .4.  That means they don't qualify as

25   compliance tests under .9(a).  It's a mouthful.

1          JUDGE TRENGA:  So how do you establish a

2   violation at the time of sale under .2(a)?

3          MR. STERN:  There are a number of ways that

4   could be done.

5          JUDGE TRENGA:  You'd have to have some

6   testing.

7          MR. STERN:  You have to have testing.

8          JUDGE TRENGA:  So who would do the testing if

9   it's not a third-party certifier?

10          MR. STERN:  Well, we talked about

11   manufacturers have to do their own self-testing, and

12   that has to be verified through a third-party

13   certifier.  That's not what's alleged here.

14          CARB can and does do enforcement testing.

15   That's not compliance testing.  What CARB does is

16   enforcement testing.

17          JUDGE TRENGA:  Doesn't your argument

18   necessarily mean that something that would satisfy

19   compliance testing is impossible after the

20   manufacturing process because under the definition of a

21   third-party certifier, a third-party certifier doesn't

22   exist for testing after the manufacturing of the

23   product?  Because you're relying on the definition of

24   third-party certifier means an organization who

25   verifies the accuracy of the emission test procedures

1    and facilities used by manufacturers to conduct

2    formaldehyde emission tests.  So if the testing occurs

3    after the process of manufacturing is completed, by

4    definition it can't have been done by a third-party

5    certifier.

6            MR. STERN:  It can't.  There are a number of

7    different ways that could happen.

8            JUDGE TRENGA:  Okay.

9            MR. STERN:  First, let's focus on CARB, what

10   would CARB do, and then we can talk about what the

11   plaintiffs have alleged.  What CARB would do if they

12   had questions and wanted to do an audit, to do a

13   routine inspection, they would go to a retailer, like

14   Lumber Liquidators, and they would buy product.

15           JUDGE TRENGA:  But that's CARB.  That's not a

16   third-party certifier.

17           MR. STERN:  Correct.

18           JUDGE TRENGA:  Right.  What I'm saying is

19   what ability is there for a third-party certifier to

20   test after the manufacturing process if your view of

21   the definition of third-party certifier is that it

22   includes only people who verify the accuracy of the

23   emission test procedures during the manufacturing

24   process and the facilities used by the manufacturer?

25           MR. STERN:  The third-party certifier has

1    independent rights of audit.  That's set forth in (41).

2              JUDGE TRENGA:  Right.

3              MR. STERN:  They could independently --

4              JUDGE TRENGA:  Well, it says and provides

5    independent audits.

6              MR. STERN:  So they could have done that.

7    They could have done that with the products these

8    plaintiffs bought.

9              JUDGE TRENGA:  A third-party certifier?

10             MR. STERN:  A third-party certifier could

11   have done that.

12             JUDGE TRENGA:  Even if they hadn't done

13   what's listed in (a) and (b)?

14             MR. STERN:  Yeah, because that's part of

15   their role.  Their role is to police the *bona fides* of

16   the manufacturers and the fabricators.  Let me try and

17   say --

18             JUDGE TRENGA:  All right.  So let's assume

19   that these laboratories were third-party certifiers.

20             MR. STERN:  Okay.

21             JUDGE TRENGA:  Well, who, then, is the

22   necessary universe of third-party certifiers?

23             MR. STERN:  They are listed on the CARB

24   website.  They are not people that we select.

25             JUDGE TRENGA:  Right.  It would be people

1  other than the people that qualify for enforcement

2  compliance.

3        MR. STERN:  They could be the same people.

4        JUDGE TRENGA:  They could be but --

5        MR. STERN:  There's a short list of

6  laboratories that do this type of small chamber testing

7  that have been approved by CARB.

8        JUDGE TRENGA:  So these certified

9  laboratories could be third-party certifiers?

10        MR. STERN:  They could be.

11        JUDGE TRENGA:  And they could have conducted

12  the required emission tests to satisfy the compliance

13  method -- I'm talking about theoretically now -- even

14  if they hadn't verified the accuracy of the emission

15  test procedures and facilities used by the

16  manufacturers to conduct formaldehyde emission tests or

17  monitored the manufacturing quality assurance programs?

18        MR. STERN:  No.  No.  Let me put it a little

19  differently.

20        JUDGE TRENGA:  So that's what I'm saying.  If

21  you went into that definition where in order to be a

22  third-party certifier, you have to have performed all

23  three functions, just not the independent audit --

24        MR. STERN:  No.  No.

25        JUDGE TRENGA:  -- no one could be a

1  third-party certifier once the manufacturing process

2  was done and the product was out of the factory.

3          MR. STERN:  No.  That's not what I'm relying

4  on.  That's not what I'm saying.

5          JUDGE TRENGA:  Okay.

6          MR. STERN:  What I'm saying is once the

7  product is done and out of the factory --

8          JUDGE TRENGA:  Right.

9          MR. STERN:  -- the only method for testing

10  whether that finished good or the core flunk .2(a) is

11  the enforcement testing method.  It's exclusive, and

12  that has to be done by CARB.

13          So to the Court's question, could CARB have

14  done compliance testing and issued a notice of

15  violation over these products, CARB couldn't do that.

16  These plaintiffs are asking you to do something that

17  CARB itself couldn't do, that is, use compliance

18  testing to find a violation under (3).  CARB would have

19  had to use enforcement testing.

20          JUDGE TRENGA:  So you're saying enforcement

21  testing is the exclusive method of testing after the

22  manufacturing process?

23          MR. STERN:  Correct, and there's a reason for

24  that.  By the way, there's a good reason for a lot of

25  these somewhat obscure sounding provisions, but the

1   reason for that is -- and this is evident in the

2   literature leading up to the promulgation.  The reason

3   is that you have a core and you have a finished

4   product.

5          The enforcement or compliance testing that

6   we're talking about here is called the constructive

7   testing.  What you do is you take the finished product.

8   You run it through a plainer.  You take the veneer off,

9   and then you measure the emissions from the now

10  delaminated product.  The theory behind deconstructive

11  testing is that the emissions that emanate from that

12  will approximate the emissions that emanated from the

13  unlaminated product.

14         But CARB recognized that there are errors in

15  the sample preparation and there are errors in

16  variability.  So you can never truly restore a finished

17  product to its prelaminated state.  CARB has generated

18  data on the relationship between the emissions that

19  come from a delaminated product versus the emissions

20  that come from the original MDF core.  They have those

21  data, and they can adjust for that.

22         They hold those, and they are their trade

23  secret.  They don't share that with other people.  But

24  in bringing an enforcement action, they will rely on

25  those data.  They will tell you this.  It's not a

1  secret. I'm not making this up, and it's also all over

2  their website.

3          JUDGE TRENGA: How do you reconcile this

4  exclusivity view that the only available method for

5  testing after the manufacturing process is enforcement

6  testing with -- oh, I see. Okay.

7          Well, where it says compliance testing is an

8  available method of establishing emission tests under

9  .2(a), why would it say that if -- it doesn't seem to

10  be limited to the manufacturing process.

11          MR. STERN: Well, that's -- it doesn't say

12  that, but if you go through .2(a), those are -- the

13  five ways in which a product can flunk are those that

14  are listed in .2(a)(1) through (5).

15          JUDGE TRENGA: All right.

16          MR. STERN: You can't just make up a new kind

17  of test and say, oh, this is compliance testing. CARB

18  couldn't do that; yet, that's what's going on here.

19  That's our position.

20          JUDGE TRENGA: All right.

21          MR. STERN: I'm almost done.

22          JUDGE TRENGA: Take as much time as you like.

23          MR. STERN: This is not easy stuff, and the

24  Court's questions have been penetrating.

25          JUDGE TRENGA: All right.

1          MR. STERN:  If there's any doubt about what a

2    retailer's obligations are -- and this has been a

3    detailed excursion we've taken through the ATCM just

4    now -- the doubt is really alleviated by CARB's own

5    fact sheet, which I prepared as a hand-up to the Court.

6    It's a two-page fact sheet.  We refer to it in the

7    reply brief.  It's on CARB's website.  It is CARB's

8    plain language instructions to retailers about what

9    their requirements are.

10          What's notable about it -- let me just call

11   up what is notable about it, but it's largely notable

12   for what it doesn't do.  What it doesn't do is what

13   plaintiffs say CARB requires, essentially a strict

14   liability standard.  If you're a retailer and you sell

15   a finished good whose core exceeds .11, you are stuck.

16   That's plaintiffs' theory.  It doesn't say that.

17          What it does -- and very quickly, the

18   call-ups are:

19          One, what is a retailer?  To answer the

20   Court's earlier question, I think this explanation

21   would make Lumber Liquidators a retailer.

22          Two, what does the composite wood products

23   regulation require?  And I refer the Court to the last

24   sentence:  Retailers need to ensure when ordering

25   finished goods from a fabricator to request only

1  products that meet regulatory requirements and

2  composite wood products.

3          Notably, it doesn't say you need to do

4  testing.  In fact, the only people that have to do

5  testing are manufacturers.  I'm going to come back to

6  that in a moment, why that's important.

7          The next page:  As a retailer, what should I

8  do to comply with the regulation?  There are five

9  checks.  Nowhere does it say you have to do periodic

10 testing.  You have to do recordkeeping requirements.

11         By the way, these five checks, these are what

12 I believe CARB would regard as reasonable prudent

13 precautions under .8(b).  They're telling you what

14 you've got to do.

15         The last call-out is midway through the

16 second page, what exemptions apply.  The first

17 sentence:  The regulation does not apply to finished

18 goods sold outside of California.  I don't think that's

19 in dispute.  It just applies to sales in California.

20         But the point of this fact sheet is that if

21 plaintiffs' theory were correct, you would think that

22 CARB would have agreed with that and would have said

23 that.

24         In conclusion on this first point, the

25 premise of the complaint is that retailers who sell

1    finished goods, whose composite wood product cores

2    flunk Phase 2 emission standards are strictly liable.

3    That can't be reconciled with four provisions of the

4    ATCM.

5              First, it reads out the reasonable prudent

6    precautions requirement of .8(b).  Why would there be

7    such a requirement?  Why would we care if you took

8    reasonable precautions?  You're liable as long as the

9    cores you sell in your finished products violate .11.

10   That makes no sense.  Courts shouldn't lightly read

11   entire provisions out of a regulation.

12             Two, to read it that way collapses the

13   definition of composite wood product and finished

14   goods.  The regulation is very clear when they're

15   talking about the one and the other.  Importantly, when

16   they're talking about finished goods that contain

17   composite wood products, plaintiffs' view collapses all

18   of this.  Everything is a composite wood product.

19             Three, we referred in our reply brief to the

20   at-time-of-sale requirement.  This reads out the

21   at-time-of-sale requirement.  I'm not going to refer to

22   that other than to mention it's in our reply brief.

23             And five -- and maybe most importantly --

24   plaintiffs' interpretation puts retailers at a higher

25   standard than manufacturers.  Manufacturers are the

1 ones who certify. They're responsible for getting

2 their products certified, for hiring third-party

3 inspectors. Under this view, retailers have an

4 inspection and a testing requirement that even CARB

5 says doesn't exist.

6         So we think the first amended representative

7 class action complaint doesn't meet the ATCM standards

8 for the three reasons I've mentioned.

9         JUDGE TRENGA: All right.

10        MR. STERN: The second point, if the Court

11 still has patience and bandwidth, I promise I can do

12 this more quickly.

13        JUDGE TRENGA: No. It's fine.

14        MR. STERN: I wanted to address whether the

15 complaint's affirmative misrepresentation allegations

16 measure up to the standing requirements of Article III

17 and the particularity requirements of Rule 9(b).

18        So just to recap quickly -- I know the Court

19 knows this -- the allegation that these products

20 violate the ATCM is unique to just the California class

21 because, as we've just seen, the ATCM doesn't apply

22 outside of California.

23        For outside California, plaintiffs have a

24 deception theory; namely, their theory is you

25 affirmatively misled people into buying by stating that

1   your products are safe, that you were in compliance

2   with California's requirements that are stringent, and

3   you didn't live up to that.  That's their claim.

4            By the way, that deception claim also applies

5   to California, but the unlawful part of that is unique

6   to California.  Everything else is a deception claim.

7            So a deception claim under whatever state law

8   is being invoked -- and here they're typically the

9   state Little FTC Acts in these five representative

10  states -- all require some version of a likely to

11  mislead standard.  So the statement has to be likely to

12  mislead people.

13           Most of these state laws have a reliance and

14  a causation requirement.  I'm not going to get down

15  into those weeds right now.  That's all in the

16  briefing.

17           But I want to focus on the statements on

18  which they rely:  Where do they reside?  When were

19  those statements made?  And what were those statements?

20  Because we think in this regard, the first amended

21  representative class action complaint doesn't measure

22  up.

23           So first, where do they reside?  Plaintiffs

24  are relying on three statements:  The CARB label that's

25  on the boxes of product that you buy when you get the

Case 1:15-md-02627-AJT-TRJ   Document 706   Filed 12/07/15   Page 55 of 83 PageID# 3386

55

1  laminate; two, the website; and three, the warranty you

2  get post purchase once you buy the product from the

3  store.   Those are the three things.

4        When were those statements alleged to have

5  been heard or when were the plaintiffs exposed to those

6  statements?  Notably, nobody except the Ronquillos

7  claims to have seen the label prior to purchase.  As

8  for the websites, only the Brandts and the Ronquillos

9  claim to have seen the websites prior to purchase.  As

10  for the warranties, nobody alleges they saw or relied

11  on them.

12        Why does this matter?  It matters because you

13  can't be deceived by something you didn't see.  You

14  can't be deceived by something you saw only after the

15  deal closed and you bought it.  You can't have standing

16  to sue over something that didn't cause you injury.

17  And if you didn't see it, it can't have caused you

18  injury.

19        All of that is briefed.  I'm not going to

20  revisit that case law, but I did want to bring the

21  Court' attention to a decision that was handed down

22  yesterday, which I handed up prior to the hearing

23  today.  Class counsel has a copy.

24        It's the *Gold v. Lumber Liquidators* case.

25  Very quickly, this is a nationwide class action pending

1    in the Northern District of California.   The claim

2    involves bamboo product but not that the bamboo product

3    gives off formaldehyde in the emissions, rather that

4    the bamboo product isn't as durable as warranted or

5    that it buckles or -- it's a performance claim, not an

6    emissions claim.

7           And yesterday Judge Henderson issued a ruling

8    on a motion to dismiss which raised many of the same

9    issues.   By the way, it was California law, New York

10   Little FTC Act, and he also issued a ruling on Illinois

11   law, which the plaintiffs were relying on all three.

12          Just very quickly, the two call-outs -- by

13   the way, as I told class counsel, there are aspects of

14   this ruling that are not favorable to other positions

15   I'm taking on the motion to dismiss.   For example, the

16   injunctive relief motion to strike.   Judge Henderson

17   reaches a different conclusion.   So I'll be the first

18   to tell you that it's a mixed bag.

19          But on the issue of Article III in standing,

20   he rejects the position that plaintiffs are advancing

21   here, which I'll come to in a moment.   But what he

22   finds for Article III -- and this is at page 7 of the

23   ruling.   He grants Lumber Liquidators' motion to

24   dismiss because as to two of the plaintiffs, they

25   didn't allege any representations were made to them --

1  they didn't allege prior to purchase or made to them at

2  all, and they didn't allege which statements they heard

3  prior to purchase were material to their purchase

4  decision.   That's at page 7.

5          By contrast, one of the plaintiffs, he

6  allowed that claim to stand.   Why?   Because when she

7  bought the product, she was told by a salesman in the

8  store, It's going to have these durability features.

9  It's going to do this and that.   That's what she

10  alleges.   That was allowed to stand.   The two

11  plaintiffs who didn't allege what they heard prior to

12  the point of sale, he dismissed that with leave to

13  amend.   But he dismissed it.

14          He also found at page 17 that the claims

15  about websites -- it's the same website as is alleged

16  here -- statements at trade shows, product retail

17  stores fails 9(b) -- he finds this at page 17 --

18  because they don't allege with particularity what they

19  heard, when they heard it, whether it was material, why

20  it was material, and prior to purchase is the critical

21  thing that Judge Henderson focused on.

22          Finally, starting at page 19, the court

23  reaches the same result on the New York claim and the

24  Illinois claim, which are also, by the way, alleged in

25  this case for much the same reason.   Because those laws

1  are no different.  They require these statements to

2  have been alleged with particularity, and they have to

3  have been alleged prior to purchase.

4          JUDGE TRENGA:  Let me ask you about the prior

5  purchase issue.  These are products like any other

6  product that's governed by the UCC to a certain extent;

7  aren't they?

8          MR. STERN:  Right.

9          JUDGE TRENGA:  Let's assume that the

10 plaintiffs don't physically see the label, the CARB

11 label, until it shows up at their doorstep.  The

12 purchase isn't complete until they accept the goods

13 upon delivery, correct?

14         MR. STERN:  I don't know that, but let's

15 assume for your question that's true.

16         JUDGE TRENGA:  Right.  So if they see the

17 label, which they allege was confirmatory of what they

18 understood, isn't it a reasonable inference that the

19 label induced their acceptance of the goods?

20         MR. STERN:  By the fact that they didn't

21 return?

22         JUDGE TRENGA:  That they didn't return or

23 reject the tender as nonconforming goods.  I mean, they

24 just rejected it.  We were told it was going to be

25 compliant.  We knew there was supposed to be a label.

1  We looked.  There was no label.  So we would have done

2  something, including inquire about why there wasn't a

3  label.

4        MR. STERN:  In theory, that might work except

5  you have to look at what does the website and what does

6  the label say.  First of all, the label is the

7  fabricator's label.  It's not our label.  Two, what the

8  label simply says is that the --

9        JUDGE TRENGA:  It's CARB compliant.

10        MR. STERN:  Well, it doesn't say that.  If

11  you actually look at the label -- that's what the

12  plaintiffs want you to think it says -- it's actually

13  gibberish.  It's almost not understandable.

14        JUDGE TRENGA:  The word "compliant" is in

15  there somewhere.

16        MR. STERN:  But compliant with the procedural

17  requisites of the ATCM that we talked about.

18        JUDGE TRENGA:  All right.  I understand.

19        MR. STERN:  It does not say the product is

20  safe.

21        By the way, the complaint alleges -- that's

22  what the complaint alleges, that we represented the

23  product is safe; yet, nowhere do we say that.  In fact,

24  the warranty, which I do recite at page 47 -- I'm

25  sorry -- the website at paragraph 47, that accurately

1 says what we do represent; yet, they don't say that was

2 false.  They don't say we didn't buy from a

3 manufacturer who wasn't certified.  They don't allege

4 any of that.

5          So the only thing I would say, to address

6 very quickly the plaintiffs' opposition brief argument

7 to all of this, is the plaintiffs don't really take

8 issue with the fact that these plaintiffs didn't see

9 these things, they didn't rely prior to purchase.  They

10 don't really fight that argument.  Rather, what they're

11 saying is nobody has to have seen anything prior to

12 purchase.  It's enough for them to allege, they say,

13 that if the public knew that Lumber Liquidators'

14 products contained many times the formaldehyde of its

15 competitors, that they wouldn't have paid as much or

16 they wouldn't have bought at all.  That's their

17 argument, and that's what they say in their opposition

18 at page 15.

19          But from an Article III and a particularity

20 standpoint, consider what they just said.  What they

21 are asking the Court to do is to find that Article III

22 is satisfied by first hypothesizing a group of

23 imaginary customers who could have relied on unread

24 statements and that created a market in which the price

25 of our products was inflated and people paid too much.

1  That theory is not sufficient to satisfy Article III.

2  Judge Henderson didn't think so.  They have to allege

3  what they saw, that they saw prior to purchase, that

4  they relied, and that it was material.  They just

5  haven't done that.

6          JUDGE TRENGA:  Don't they also allege,

7  though, that under the unlawful prong of the unfair

8  competition law -- and I understand they allege that

9  part of the unlawfulness was the misrepresentations.

10 But isn't part of their theory also that they engaged

11 in unlawful conduct -- if you accept their theory, they

12 engaged in unlawful conduct by the fact of selling a

13 product that had a core that violated Table 1?

14         MR. STERN:  Correct.

15         JUDGE TRENGA:  There's no misrepresentation

16 element of that particular claim?

17         MR. STERN:  That's correct.  As I started

18 out --

19         JUDGE TRENGA:  So that would mean you don't

20 need to have reliance on the warranties, the alleged

21 misrepresentations that they allege elsewhere?

22         MR. STERN:  That's correct, but they only

23 allege that for the California class.

24         JUDGE TRENGA:  Right.  I understand.

25         MR. STERN:  And nor could they go beyond

1  that.  That was the point I made at the top of the

2  section by saying for California, they allege the

3  unlawful and deceptive.  For the rest of the states,

4  it's just deceptive because they can't allege unlawful

5  at least as to the CARB violation.

6          JUDGE TRENGA:  I understand.

7          MR. STERN:  Your Honor, with that long-winded

8  soliloquy, I am done unless the Court has questions.

9          JUDGE TRENGA:  All right.  Let me hear from

10  the plaintiff.

11          Mr. Berman.

12          MR. BERMAN:  Your Honor, do you want to take

13  a recess, or do you want me to just go?

14          JUDGE TRENGA:  Ms. Montgomery, how are you

15  doing?

16          THE COURT REPORTER:  I'm fine.  Thank you.

17          JUDGE TRENGA:  All right.  Let's keep going

18  for a little bit longer.

19          MR. BERMAN:  All right.  I have a couple of

20  handouts if I may, Your Honor.

21          JUDGE TRENGA:  All right.

22          MR. BERMAN:  I have two copies of each.

23          MR. STERN:  Your Honor, I'm going to have an

24  objection to one of them, but I'll wait until the

25  bailiff hands it up.

1          JUDGE TRENGA:  All right.

2          MR. BERMAN:  Okay.  Your Honor, I would start

3   where you started.  I'm on the yellow highlighted

4   sections of the regulations we've been looking at, and

5   I'm going to go to page 22.  That is the Section .8(a)

6   and Section .8(b).  Now, you asked Mr. Stern -- well,

7   as we know, Section .8(a) says that the emission

8   standards apply to all retailers.  All retailers must

9   comply with the requirements of .2(a) for all composite

10  wood products and finished good products containing

11  these materials.  I think it's beyond dispute that the

12  products at issue here are composite wood products and

13  finished goods containing composite wood.  So .8(a) and

14  .2(a) clearly apply to Lumber.

15          So that gets us to (b).  You immediately

16  focused on the very last sentence of (b) and asked,

17  Well, doesn't that mean that (a) is stand-alone, that

18  you have to still comply with (a) in addition to (b)?

19  And Mr. Stern says, Well, I'm reading it.  They must've

20  intended that they be read together.  But I don't think

21  that's a fair reading of the regulation because it says

22  on its face, This section does not affect the liability

23  of any person for any violation of Section 93120.2(a).

24          Then if you look at the very heading of

25  .8(b), it says Additional Requirements.  Well, the word

1  "additional" has to mean in addition to those that

2  Lumber had to comply with in .8(a).  And it says,

3  Additional requirements to help ensure that complying

4  composite wood products and finished goods are

5  purchased.  Retailers must do various things.

6          Well, it makes sense because it's the

7  retailer that ultimately is placing this product in

8  front of the consumer.  So the regulators here want

9  retailers to do more than anyone else.  In addition to

10  complying with (a), they have to take care of (b).  So

11  (b) is not a safe harbor.  Lumber is liable if it

12  violated (a).

13          So let's take a look at (a), and that's on

14  page 8.  You're probably sick of looking at it, but it

15  says, A finished good contains any composite wood

16  product which does not comply with the emission

17  standards.

18          There's no question that the products here at

19  issue are composite wood products because

20  Section 93120.1(a)(8) defines composite wood products

21  to include medium density fiberboard.  That's the

22  product at issue in this case.

23          And finished goods at 93120.1(a)(15) is

24  defined as any good or product containing medium

25  density fiberboard, which, again, is this product.

1            And Section 93120.1(a)(25) defines the word

2    "laminate product," and it includes a finished good in

3    which if the platform consists of a composite wood

4    product, meaning an MDF core, the platform must comply

5    with the applicable emission standards.

6            So clearly, Section (4) applies to Lumber.  I

7    think Mr. Stern -- after all the very nice

8    construction, when you asked him the question, he said

9    that's correct.  So then he went to -- really, his

10   point is that we haven't alleged a violation of the

11   regulations because we have not alleged a proper

12   violation of the compliance test method, and this gets

13   into the certified laboratory issue.

14           But before I go to that, if we thought that

15   Section (b) was the only section that applied, we

16   allege in paragraph 11, paragraph 49, paragraph 55, and

17   paragraph 60 -- 11, 49, 55, and 60 -- that Lumber

18   Liquidators knew that the boards it was buying from

19   China were not CARB compliant.  So we're alleging a

20   violation of .8(b) even if we had relied on .8(b),

21   which we don't.

22           But then let's turn to this testing issue.  I

23   think you're right that the statute or regulation

24   allows for the testing at any time after it is

25   manufactured.  And so then the testing by whom?  Well,

1  in paragraph 43 of the complaint, we allege that

2  between June 2013 and January 2015, at least three

3  separate laboratories accredited by the International

4  Accreditation Service conducted tests of 134 samples in

5  compliance with CARB, specifically ASTM D 6007-02.

6  That's the very regulation in part 9 that Mr. Stern was

7  referring to.

8          JUDGE TRENGA:  And you contend that the

9  certified laboratories are third-party certifiers?

10         MR. BERMAN:  I don't know that, but I do know

11  that we alleged that they complied with the

12  requirements of ASTM D 6007-02.

13         JUDGE TRENGA:  Is that enough if they're not

14  a third-party certifier?

15         MR. BERMAN:  Well, if you read the rest of

16  the statute -- or the rest of that regulation,

17  Section (B) and so forth, it would seem that you

18  couldn't be doing the testing unless you were

19  evidencing that you met the requirements because (b)

20  says --

21         JUDGE TRENGA:  You're looking at which

22  section?

23         MR. BERMAN:  Well, I start with (A):  The

24  secondary method shall be operated using the testing

25  conditions and loading rates --

1              JUDGE TRENGA:  Are you under .9?

2              MR. BERMAN:  Yes, Your Honor.  I'm looking at

3  (A) under .9.

4              So we allege compliance with (A), and I don't

5  know sitting here today if you comply with (A) you're

6  necessarily certified.  It would seem like you would

7  have to be, but I don't know that.  But I'm not sure we

8  need to get there for this reason, and the reason is

9  the following:

10             We allege in the complaint that *60 Minutes* --

11  I'm sure you're aware -- did testing of Lumber's

12  product.  And *60 Minutes* went to Lumber's certified

13  laboratory Benchmark and had Benchmark conduct the

14  testing.  So they're certified under the statute, and

15  the test flunked.

16             So even if the plaintiffs' tests weren't by a

17  certified laboratory, *60 Minutes* went to a certified

18  laboratory, and the complaint alleges they flunked.  So

19  we've --

20             JUDGE TRENGA:  But you have the same issue,

21  whether it could meet the definition of a third-party

22  certifier.

23             MR. BERMAN:  That's what they did for Lumber.

24  They are one of Lumber's certified laboratories, and

25  that's why *60 Minutes* went to them.

1           JUDGE TRENGA:  I see.

2           MR. BERMAN:  And so we've -- to summarize our

3   position on the statute under .8(a), they clearly have

4   a stand-alone obligation to not violate the emission

5   standards.  We allege that they violated the emission

6   standards.  We allege that various labs, including the

7   Benchmark lab used by *60 Minutes*, found that Lumber

8   Liquidators had failed the CARB regulations.

9           That gets me to the last point I want to

10  make, Your Honor, and that's the following:

11          I'm going to refer briefly to the document.

12  It's marked confidential.  I'll try to do that in a way

13  that -- well, I don't think I'm violating the

14  protective order.

15          JUDGE TRENGA:  Is this what you have an

16  objection to?

17          MR. STERN:  I do, Your Honor, for two

18  grounds:  One, this is a motion to dismiss, and

19  evidence, particularly evidence I've been handed an

20  hour before, a document that was produced, has no role

21  in it.  We didn't bring it up.  It is not part of their

22  opposition.  Two, it's subject to a protective order,

23  and I think we'd have to close the court and shut off

24  the phone.

25          JUDGE TRENGA:  All right.

1            MR. BERMAN:  It's relevant to two points,

2  Your Honor.  I won't say what's in the document.  One,

3  it goes to -- if Your Honor thinks we haven't alleged

4  compliance or a violation of the statute -- a grounds

5  for amendment that will clearly allow us to allege

6  violation of the statute.

7            JUDGE TRENGA:  I'm going to consider it.  I'm

8  not going to put on the record what it is at this

9  point.  Let me just read it.

10           Without getting into the substance on the

11  record of this document, Mr. Berman, you think this is

12  supportive of your view that if the Court found in some

13  fashion the complaint inadequate, it would allow for

14  appropriate amendments or for some other purpose?

15           MR. BERMAN:  Two things, Your Honor:  Number

16  one, it casts doubt on the argument made here today

17  that the entire regulatory scheme doesn't apply to --

18           JUDGE TRENGA:  All right.

19           MR. BERMAN:  Clearly, the regulator thinks it

20  does.

21           JUDGE TRENGA:  I understand.  That's

22  basically your response to Mr. Stern's reliance on the

23  composite wood products fact sheet?

24           MR. BERMAN:  Yes.

25           JUDGE TRENGA:  All right.

1          MR. BERMAN:  And second, Your Honor, it goes

2    to -- we would allege violation of the enforcement

3    standards as well now because that's -- without saying

4    more.

5          JUDGE TRENGA:  All right.

6          MR. BERMAN:  Okay.  Then that's all I have

7    for the statute.

8          I would like to address one of the points

9    made by Lumber, and that goes to the injunctive relief

10   claim.  On that, Your Honor, I would ask the Court to

11   pay attention.  There's a lot of material you've

12   gotten, but I think really important is the -- I can't

13   even say it, so I'll just spell it,

14   S-H-A-H-I-N-I-A-N -- *Shahinian v. Kimberly-Clark* case.

15   It's a 2015 case.  The defendant --

16          JUDGE TRENGA:  Do you have a cite?

17          MR. BERMAN:  Yes, I do.  It's 2015 WL

18   4264638.

19          JUDGE TRENGA:  426 --

20          MR. BERMAN:  4264638.

21          JUDGE TRENGA:  Thank you.

22          MR. BERMAN:  What the defendants have argued

23   here is because our plaintiffs, after they bought the

24   product, now know that the product was not as

25   represented, they don't have standing to bring claims

1  for injunctive relief.  That court citing a Second

2  Circuit case and several other cases, I think, hit the

3  nail on the head.  The court said, If the court were to

4  construe standing as narrowly as the defendant

5  advocates, federal courts would be precluded from

6  enjoining false advertising because a plaintiff who had

7  been injured would always be deemed to avoid the cause

8  of the injury thereafter, once bitten, twice shy, and

9  would never have Article III standing.

10          That's the basis of their motion, that you

11  can't seek an injunction now that you know the truth.

12  That case and the cases cited in there say you do have

13  standing to seek an injunction.  So that's the only

14  point I wanted to make on that.

15          JUDGE TRENGA:  All right.

16          MR. BERMAN:  That's all I have, Your Honor.

17          JUDGE TRENGA:  All right.  Mr. Stern,

18  anything?

19          MR. STERN:  Just very briefly.

20          MR. BERMAN:  I think Ms. --

21          JUDGE TRENGA:  Oh, I'm sorry.  Ms. Fineman.

22          MS. FINEMAN:  Thank you, Your Honor.  Nancy

23  Fineman addressing two issues.

24          JUDGE TRENGA:  Yes.

25          MS. FINEMAN:  On the dec relief, it's our

1   position that there is still ongoing potential for the

2   sale, and even though it doesn't dispose of the entire

3   action, the Court has discretion to allow the dec

4   relief to proceed.

5             As to the issue about the standing and the

6   .9(b), we do believe that, number one, the unlawfulness

7   applies not only to the California statutory claims but

8   also to all of the warranty claims.  So it's important

9   for the unlawful prong, but as to the specificity of

10  the representations --

11            JUDGE TRENGA:  How does that feed into the

12  non-California cases?

13            MS. FINEMAN:  For just the idea that because

14  you have a noncompliance with CARB, they've represented

15  that there's CARB compliance even --

16            JUDGE TRENGA:  What they've said is it's

17  misleading without further disclosure.

18            MS. FINEMAN:  Or it's still a breach of the

19  warranty because it's not as represented for the

20  non-California cases.

21            Specifically, as to the representations, we

22  do believe that we have satisfied both the standing

23  requirements and the .9(b) requirements.  Mr. Stern

24  said that we only were looking at -- increase the

25  pricing, so we relied on the representations.  That is

1  a sub-argument, but we do believe -- and if you start

2  at paragraph 69 and walk through each of the

3  plaintiffs -- that we've shown that each of them did

4  have reliance on representations.

5         And I think what our dispute is is how

6  specific does a pleading have to be.  I'd suggest that

7  the Court look at the *Kwikset* case, K-W-I-K-S-E-T,

8  which is cited in the briefs.

9         JUDGE TRENGA:  All right.

10        MS. FINEMAN:  It's California Supreme Court

11  case 51 Cal. 4th 310, and especially page 327.  And

12  this was a case about whether the Made in USA label

13  could support a 17200.  Our California Supreme Court

14  said, At the pleading stage, general factual

15  allegations of injury resulting from the defendant's

16  conduct may suffice.  For on a motion to dismiss, we

17  presume that general allegations embrace those specific

18  facts that are necessary to support the claim.

19        Then the court cites to the *Lujan* case, a

20  U.S. Supreme Court case.

21        So for each of our plaintiffs, we allege that

22  the representations that they saw were the reason that

23  they purchased.

24        I think Your Honor's point that they

25  purchased and then used -- because it's not just buying

1    the lumber, it's installing it at their home.  Until

2    it's installed in their home, it's not really the

3    purchase of it and they still can return it.

4           The only difference is with *Balero*.  It's not

5    as specific as to what he saw, but the allegations

6    starting in paragraph 91 is that he wanted a safe

7    product and he's a California resident where it could

8    not be sold.  So he had the expectation that there's

9    going to be something that is compliant with the law

10   that he purchased.

11          And we in California are very aware of having

12   environmentally friendly regulations in kind of all

13   aspects.  So we believe that even him that doesn't

14   specifically have a website has it.

15          And the difference between what is the

16   affirmative misrepresentation between the misleading,

17   they both are really the same -- different sides of the

18   same coin.  We believe that the website is factually

19   inaccurate but also misleading if it's not found to be

20   an affirmative misrepresentation.

21          And for all of the state's laws, the fact

22   that you start to speak, you have a duty to speak the

23   whole truth, and there are emissions because of what

24   they failed to do.

25          So unless you have questions about -- because

1   Mr. Stern just focused in on a couple of the issues he

2   wanted.  There's something I wanted to raise that we

3   didn't cover, but if Your Honor didn't --

4           JUDGE TRENGA:  That's fine.  Did you want to

5   address some other issues?

6           MS. FINEMAN:  There's nothing that I wanted

7   to address.  I just didn't want it to be defined by

8   what Mr. Stern did.  In case you had questions, I was

9   prepared to address any.

10          JUDGE TRENGA:  That's fine.  Thank you.

11          Is that it for the plaintiffs, Mr. Toll?

12          MR. TOLL:  That's it, Your Honor.

13          JUDGE TRENGA:  All right.  Yes, Mr. Stern.

14          MR. STERN:  Thank you, Your Honor.  I will

15   keep these comments brief.

16          To Mr. Berman's point about the dialogue you

17   and I had and he had with the Court about the testing

18   and whether the labs were certified and the question

19   confronting the Court is whether that's the same as the

20   compliant testing done by a third-party certifier, I

21   have this brief comment:  The compliance testing that's

22   contemplated in the ATCM, as its name implies, is to

23   test for compliance as the material is being

24   manufactured at the site of manufacture before it's

25   shipped.  It's to arrest emissions violation in the

1  process.

2          And it makes sense that that has to be a TPC,

3  a third-party certifier, because CARB wants to make

4  sure that the entity it deputizes to be the policeman

5  of these emissions is somebody that it has confidence

6  in and it has certified to do this testing.

7          If you think about smog emissions testing,

8  you want to make sure that the state licenses the guys

9  who check the emissions from your car because they,

10 after all, are the final stopgap before, you know, cars

11 are unleashed on the road that may potentially pollute.

12 So they have to be licensed, and their equipment needs

13 to be calibrated and validated so that their measuring

14 is proper.  Okay.  That's what compliance testing is.

15         And to the Court's question about (a)(3) and

16 why that is the only provision that applies at the time

17 of manufacture, that's exactly why they do require

18 third-party certification.

19         So what the plaintiffs are trying to do is do

20 what CARB would consider to be enforcement testing, and

21 only CARB can do that.

22         JUDGE TRENGA:  I understand --

23         MR. STERN:  That part you understand.

24         JUDGE TRENGA:  Well, I understand the

25 argument and why it makes sense within the structure of

1    the regulation.  What I'm struggling with, though, is

2    how -- and this applies to a number of other points

3    that really cut both ways.  There are various pieces

4    here and there that are difficult to reconcile with

5    what you would otherwise think the structure of the

6    statute would have the regulations say.

7              I'm focused on, again, Subsection (3) of

8    .2(a), which says that you can establish a failure to

9    comply with emission standards by testing at any time

10   after it is manufactured using either the compliance

11   test method or the enforcement method.  So if the

12   compliance test method was for the purposes of ensuring

13   compliance during the manufacturing process, you

14   wouldn't expect to see that as an option in (3) for any

15   time after manufacture.

16             MR. STERN:  Well, actually, I think it does

17   make sense.

18             JUDGE TRENGA:  Okay.

19             MR. STERN:  Because from the standpoint of

20   CARB, which is the regulator, they could use compliance

21   testing, and they could actually probe further either

22   of a retailer or a manufacturer and decide, Okay, so we

23   looked at your compliance tests.  We find that X

24   numbers of them exceed .11.  How many lots did you

25   sell?  How many came from that lot?  How many came from

1   Manufacturer X versus Manufacturer Y?  This is the kind

2   of investigation that CARB does.

3            Then they can issue stop orders.  There's a

4   lot of remedies they have, and some of those are -- and

5   the point being at any time would make sense to allow

6   CARB that latitude to arrest that process from that

7   manufacturer.  If they're going to enforce --

8            JUDGE TRENGA:  So CARB can do compliance

9   testing?

10           MR. STERN:  Well, no.

11           JUDGE TRENGA:  All right.

12           MR. STERN:  TPCs, third-party certifiers.

13           JUDGE TRENGA:  That's my point.  The fact the

14  definition of third-party certifier, which you were

15  arguing --

16           MR. STERN:  Yes.

17           JUDGE TRENGA:  -- by its definition is

18  somebody who is verifying the emissions during the

19  manufacturing process --

20           MR. STERN:  That's right.

21           JUDGE TRENGA:  Here you have specifically a

22  reference to compliance testing, which would require a

23  third-party certifier, involved in measuring emissions

24  after the manufacturing process.  That's what it says,

25  at any time after it is manufactured.  So how do you

1  reconcile all of that?

2          MR. STERN:  Well, all right.  Retailers and

3  other actors in the downstream distribution can sell

4  MDF.  They don't have to just sell finished goods.  We

5  happen to only sell finished goods.

6          JUDGE TRENGA:  All right.

7          MR. STERN:  And so if you were to go to a

8  lumberyard and pick up a piece of MDF, you could do

9  that compliance testing, quote, at any time, unquote,

10 and that could still be compliance testing.

11         JUDGE TRENGA:  Who could do that?

12         MR. STERN:  Potentially --

13         JUDGE TRENGA:  There is no third-party

14 certifier that could do it.

15         MR. STERN:  It's possible.  I'm theorizing.

16         JUDGE TRENGA:  The definition of third-party

17 certifier, as I understand your interpretation of it --

18         MR. STERN:  It could under (c), meaning as

19 part of its audit and inspection process.

20         JUDGE TRENGA:  It's not disjunctive.  It's A,

21 B, and C.  It's somebody who, (A), verifies; (B), does

22 something else; and (C), performs the audit.  It's not

23 somebody who does one of those things.

24         MR. STERN:  No.  But I would argue that a

25 third-party certifier of Manufacturer X has the

1   authority not only to do compliance testing at the

2   factory but also in theory could buy sample product in

3   this country and do compliance testing.

4          JUDGE TRENGA:  I guess you could read it to

5   mean somebody who was approved to do all of these

6   things but that doesn't necessarily have to do them

7   all.

8          MR. STERN:  I read it to mean that these are

9   the functions that a third-party certifier is approved

10  to perform.

11         JUDGE TRENGA:  To perform, not that he

12  necessarily has to do those?

13         MR. STERN:  Correct.

14         JUDGE TRENGA:  Okay.

15         MR. STERN:  All right.  Thankfully, enough on

16  that point.  I'm going to move on.

17         Very quickly, to Ms. Fineman's two points, to

18  respond to Ms. Fineman's arguments, she made reference

19  to the warranty claim and specifically referring to the

20  Court's comment during my discussion about how the

21  failure of a consumer to return a product may be

22  during -- after delivery could constitute reliance on a

23  CARB label.  Okay.  And Ms. Fineman adopted that

24  argument and suggested that the complaint can stand

25  under that interpretation.

1          But the problem is you have to go back to

2    what the warranty is that they allege.  They're not

3    clear on what the warranty is.  We now know from their

4    opposition that the CARB label is not the warranty.

5    They said that at page 28 of their opposition.

6          Interestingly, what they quote in the amended

7    complaint at paragraph 47 is not the retail warranty

8    that customers get.  That's the commercial purchase

9    order that Lumber Liquidators demands of its

10   manufacturer.  Somehow they found that, and they are

11   claiming that this is the retail consumer warranty.

12   It's not what it is.

13          JUDGE TRENGA:  This is the purchase order

14   between Lumber Liquidators and its --

15          MR. STERN:  Correct.  This is the

16   representations and warranties that the commercial

17   manufacturers -- the wholesale manufacturer gives to

18   Lumber Liquidators.  That's not a warranty a consumer

19   ever sees.  We addressed this in the opening.  They

20   didn't correct this in the opposition.  The Court, I

21   think, needs to assume they have no answer to that.

22          So the point being, whatever this notion is

23   that a consumer's acceptance post delivery constitutes

24   reliance on a statement begs the question what's the

25   statement.

1          JUDGE TRENGA:  I understand.

2          MR. STERN:  Finally, Ms. Fineman referred to

3   the *Kwikset* decision, the California Supreme Court

4   decision that suggests that there may be a more relaxed

5   particularity requirement.  That's a California Supreme

6   Court decision.  The California Supreme Court doesn't

7   get to decide pleading requirements in federal court

8   and in this exact issue was faced by Judge Henderson

9   yesterday in the *Gold* case.  And Judge Henderson, I

10  think, correctly said, I'm governed not by California

11  pleading law but by -- there it was Ninth Circuit law.

12          Thank you, Your Honor.

13          JUDGE TRENGA:  Thank you.  I want to

14  compliment both counsel for helping the Court work

15  through this.

16          I'm going to take it under advisement, and I

17  will get a decision to you just as soon as I can.

18          Yes, Mr. Berman.

19          MR. BERMAN:  Your Honor, very briefly, I

20  referred to the *60 Minutes* --

21          JUDGE TRENGA:  Come to the podium.

22          MR. BERMAN:  Sorry.  I just want to make it

23  easier for you, and I neglected -- I referred to the

24  fact that we alleged that *60 Minutes* sent samples to a

25  certified laboratory, and that is at paragraph 10.

1          JUDGE TRENGA:  All right.  Thank you.

2          All right.  Counsel is excused.

3          We'll stand in recess.

4          ------------------------------------
                    Time:  3:51 p.m.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21
       I certify that the foregoing is a true and
22
   accurate transcription of my stenographic notes.
23

24
                              _____
                                        /s/
25                            Rhonda F. Montgomery, CCR, RPR


       Rhonda  F.  Montgomery    OCR-USDC/EDVA    (703)  299-4599